UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

T.O.,[1]

                    Plaintiff,

        v.

ANDREW SAUL,

                    Defendant.

Case No. 18-cv-04313-JCS

**ORDER REGARDING CROSS MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 28, 29

## I.    INTRODUCTION

Plaintiff T.O. brings this action challenging the final decision of Defendant Andrew Saul, Commissioner of Social Security, (the "Commissioner") denying T.O.'s application for disability benefits after a hearing before an administrative law judge (the "ALJ").  The parties filed cross motions for summary judgment pursuant to Civil Local Rule 16-5.[2]  For the reasons discussed below, T.O.'s motion is GRANTED, the Commissioner's motion is DENIED, and the matter is REMANDED for further administrative proceedings consistent with this order.[3]

## II.    BACKGROUND

T.O. filed his application for disability benefits on December 18, 2014, alleging a disability onset date of October 1, 2014.  *See* Admin. Record ("AR," dkt. 13) at 15 (ALJ's decision,

---

[1] Because opinions by the Court are more widely available than other filings, and this order contains potentially sensitive medical information, this order refers to the plaintiff only by his initials.  This order does not alter the degree of public access to other filings in this action provided by Rule 5.2(c) of the Federal Rules of Civil Procedure and Civil Local Rule 5-1(c)(5)(B)(i).

[2] The Court previously addressed disputes between the parties concerning scheduling and T.O.'s counsel's misuse of "stipulations" to which the Commissioner had not specifically agreed.  Those issues have no bearing on the present substantive motions.

[3] The parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

1    summarizing the procedural history of T.O.'s application).  His application was denied initially on

2    April 23, 2015 and denied again on reconsideration on August 14, 2015.  *Id.*  Much of the relevant

3    medical history occurred during the intervening period between T.O.'s initial application and the

4    ALJ's September 13, 2017 decision.

5        **A.    Medical Records**

6        The following summary of T.O.'s medical records focuses on records identified by the

7    parties and the ALJ and relevant to his alleged disability.  It is not intended as a complete

8    recitation of either the administrative record or T.O.'s medical history

9        T.O. experienced seizures when he was young but was seizure-free for many years until

10   they began again in January of 2014.  *Id.* at 318.  His seizures are generally nocturnal and involve

11   tongue-biting and incontinence.  *Id.* at 327.  Notes from an April 2014 visit to the San Mateo

12   Medical Center indicate that T.O. was treated at Kaiser until he lost his insurance.  *Id.* at 318.

13       On April 5, 2014, T.O. had a seizure in his sleep, another early in the morning, and a third

14   while he was at the hospital.  *Id.*  The report from that visit describes T.O. as "critically ill" and his

15   then-current symptoms as "severe."  *Id.*  T.O. reported regularly taking Depakote for his seizures.

16   *Id.* at 318–19.  He had a fever and was given a number of intravenous medications at the hospital.

17   *Id.* 321–22.  He reported consuming more than five alcoholic beverages per day.  *Id.* at 318.

18       T.O. visited the San Mateo Medical Center again on December 10, 2014 after experiencing

19   two seizures the day before, and reported that he felt weak.  *Id.* at 314.  Tests were generally

20   normal.  *See id.* at 314–17.  T.O. was advised not to drive and to return if his condition worsened.

21   *Id.* at 317.

22       A week later on December 17, 2014, T.O. visited the Stanford Hospital Comprehensive

23   Epilepsy Center for a consultation.  *Id.* at 327.  Dr. Kimford Meador reported that T.O.'s memory

24   and awareness were impaired during his seizures and that he experienced fatigue, joint and muscle

25   pain, reduced appetite, headaches, and increased depression after seizures.  *Id.*  Despite the April

26   2014 seizure that T.O. experienced at the San Mateo Medical Center noted above, *see id.* at 318,

27   Dr. Meador wrote that T.O.'s seizures occurred "exclusively during sleep," *id.* at 327.  Dr. Meador

28   wrote that T.O. had been experiencing one seizure per month, most recently on December 9, 2014,

and that the episodes had been worsening over the course of the year. *Id.* Dr. Meador also noted that T.O. had experienced recent depression with "some suicidal ideation but no plans," as well as "weight loss, postictal[4] fatigue, insomnia (onset), blurred vision, chest pain, stomach pain, headaches, depression, anxiety, memory problems, and postictal joint/neck/back pain." *Id.* at 328. Based on some basic tests, T.O.'s mental orientation and memory were generally intact. *Id.* at 329. At the time, T.O. was "not working because of seizures." *Id.* at 328. Dr. Meador concluded that T.O. had "medically resistant epilepsy" and depression, increased his seizure medication, and noted that T.O. would "seek psychiatric therapy from his county mental health department or via referral by his [primary care provider]." *Id.* at 329.

On January 30, 2015, T.O.'s wife J.O. completed a function report to support T.O.'s application for disability benefits in which she stated that, after his seizures, T.O. was "very weak, confused, sleeping a lot, vomiting, cannot eat and extremely depressed for weeks," and that he could not "get up and work for 2 weeks or more." *Id.* at 217–18. According to T.O.'s wife, he had limited ability to complete household chores and care for his hygiene, particularly after seizures, and he needed "constant reminders" to do so. *Id.* at 218–19. She also repeatedly noted T.O.'s depression. *Id.* at 217–24.

An MRI of T.O.'s brain in January of 2015 was initially reported as normal, but on further review months later, indicated some issues with T.O.'s hippocampus. *Id.* at 341, 353.

A two-week continuous video electroencephalogram (EEG) in March of 2015 recorded "[e]leven seizures of right temporal onset," among other irregularities. *Id.* at 353.

On April 2, 2015, Dr. Meador noted that T.O.'s last seizure (presumably excluding those recorded by the EEG in March) was on February 22, 2015 and that he had not had a seizure since he began taking Zonisamide at some point since then. *Id.* at 343. T.O. also had a seizure in January of 2015. *Id.* at 353.

Neuropsychological testing on April 15, 2015 indicated "results . . . consistent with right temporal compromise" and supported a recommendation for continued monitoring and treatment

---

4 The term "postictal" refers to the period of time following a seizure.

of depression and anxiety. *Id.* at 353. T.O. again reported suicidal ideation but no suicidal intent. *Id.*

In late April of 2015, state agency medical consultants Dr. J. Bradus and Dr. R. Ferrell reviewed T.O.'s medical records and assessed generally mild restrictions, resulting in a determination that T.O. was not disabled. *See id.* at 60–72.

An FMRI in late April and a PET-CT scan in May of 2015 suggested slightly elevated signals in certain structures of T.O.'s brain that could "correlate with clinically suspected MTS," or mesial temporal sclerosis, a condition associated with forms of epilepsy. *Id.* at 338, 353, 518. As of May 12, 2015 Dr. Meador and Dr. Anahita Aghaei-Lasboo considered T.O. a potential candidate for brain surgery. *Id.* at 353. T.O.'s brother committed suicide in May of 2015. *Id.* at 531.

In August of 2015, Dr. Meador reported that T.O.'s seizures had improved on Zonisamide but had continued at a rate of about one per month since T.O.'s April 2, 2015 visit. *Id.* at 531. The most recent seizure was on July 15, 2015, and the most recent seizure that occurred when T.O. was awake was in February. *Id.* Dr. Meador referred T.O. for laser neurosurgery. *Id.* at 535. He also addressed T.O.'s psychiatric issues as follows:

> His insurance did not cover our Neuropsychiatry. We talked at length about the need for treatment for his depression, especially in view of his brother's recent suicide. He has promised to seek a psychologist or psychiatrist near his home.

*Id.*

Also in August of 2015, state agency medical consultants Dr. Joshua Schwartz and Dr. H. Samplay again assessed generally mild restrictions, resulting in a second finding of non-disability on reconsideration of T.O.'s application. *See id.* at 74–86. Dr. Samplay noted that a "PET scan was negative for any seizure focus" and that T.O. had no seizures "since 2/15 with the addition of a new medication," *id.* at 82, apparently overlooking or lacking access to the medical records discussed above that include contrary information.

Dr. Casey Halpern, of the Stanford Health Care neurosurgery department, evaluated T.O. on August 31, 2015 and concluded that he was a "reasonable candidate for left hippocampal

ablation," to be completed in October. *Id.* at 542–53. Dr. Halpern noted "no obvious defects in [T.O.'s] thought process, memory, or attention span." *Id.* at 543. Dr. Halpern conducted a preoperational exam on October 12, 2015 and noted worsening seizures over the past year. *Id.* at 546. Despite risks from surgery potentially including paralysis or death, T.O. was "eager to proceed because his seizures [were] becoming more frequent and significantly reduce[d] his quality of life." *Id.* at 550. Dr. Halpern noted that T.O. used marijuana to manage his anxiety and had a "history of alcohol dependence but has abstained [for] 3 years now." *Id.* at 549. T.O. was "currently on disability" at the time of the examination. *Id.* Dr. Halpern performed the surgery without complications on October 20, 2015. *Id.* at 563.

On December 14, 2015, Dr. Halpern saw T.O. for post-operation review of imaging and noted that T.O. "had swings of lethargy and no sleep," as well as diarrhea and a loss of appetite. *Id.* at 661. T.O. believed that his depression might have been at least partially responsible for those symptoms. *Id.* Dr. Halpern reported that T.O. was "very depressed but denie[d] a plan for suicide," saying that his brother's suicide was "not the future he plan[ned for] himself." *Id.* at 662. Dr. Halpern noted that T.O. was "seeing a therapist in the very near future," but it is not clear whether that occurred. *Id.* T.O. was slightly emaciated and had a loss of color in his face, and failed to go to a lab as instructed. *Id.* at 661.

Dr. Meador evaluated T.O. on December 28, 2015 and reported that he had two seizures since surgery: one in later October when he missed a dose of medication, and one in November while he was asleep. *Id.* at 669. T.O. continued to experience depression and suicidal ideation, and Dr. Meador stated that T.O. was "making an appointment to see [a] therapist with the local mental health clinic." *Id.* at 669–70.

Dr. Meador evaluated T.O. again on April 14, 2016 and noted no seizures since his December 2015 visit but continued depression "with some suicidal ideation." *Id.* at 588; *see also id.* at 593 (noting "Depression with disrupted sleep pattern and suicidality (no plans)"). Dr. Meador recommended that T.O. follow up with a psychiatrist. *Id.* at 594.

In September of 2016, T.O. was subject to an involuntary psychological hold at the Fremont Hospital after his wife reported to the police that T.O. made suicidal comments with a

gun in front of him. *See id.* at 422, 433. A hospital intake form indicates that police confiscated multiple firearms. *Id.* at 411. T.O. complained of seizures, insomnia, and depression and was assessed as a moderate suicide risk. *See id.* at 424, 427–28. He tested positive for THC and PCP. *Id.* at 407. A doctor wrote:

> Please note that the patient continues to have multiple neurovegetative symptoms of depression. He is very tearful on exam and continues to be in acute distress. He continues to be high risks for suicidality given that he has multiple risk factors for that. We will continue to titrate the medications and once stable [he] will be discharged back to the community and to his home.

*Id.* at 405. T.O. reported that he was participating in both family and individual therapy before he was hospitalized. *Id.* at 403. T.O. also reported that he had last seen Dr. Meador in December of 2015, *id.* at 401, omitting his visit to Dr. Meador in April of 2016, and that he had no seizures since his surgery, *id.* at 445, despite his neurologists noting multiple such seizures. T.O. reported that despite a history of heavy drinking he had "been clean and sober for 5 years," *id.* at 445, which contradicted medical records from 2014 indicating that T.O. consumed more than five alcoholic beverages per day, *see id.* at 318. "A cognitive exam revealed significant memory deficits." *Id.* at 445.

T.O. was ultimately discharged days later with a "safety plan" including suicide hotline information and a plan to follow up with a psychiatrist and therapist or case manager. *Id.* at 420–21. It is not clear whether any such follow-up occurred. During the hospitalization, Dr. John Furman assessed a GAF score of 25, which the ALJ acknowledged "indicat[ed] the need for inpatient stabilization." *See id.* at 21, 446.

In January of 2017, Dr. Meador noted that T.O. experienced several seizures in November of 2016 after discontinuing one of his medications, which Dr. Meador had not instructed him to do. *Id.* at 601. T.O.'s depression and suicidal ideation continued, and he was going through a divorce and caring for his son. *Id.*

Consulting psychologist Dr. Paul Martin, Ph.D., examined T.O., conducted a number of tests, and prepared a report on February 28, 2017. *Id.* at 364–70. T.O. reported to Dr. Martin that his brain surgery occurred about one month earlier, when it had in fact occurred four months

6

earlier, and also denied any psychiatric hospitalization, failing to identify the September 2016 involuntary hospitalization. *See id.* at 365–66 (accepting T.O.'s reported medical history because Dr. Martin lacked access to the underlying records). T.O. stated that he was sexually abused by family members as a child. *Id.* at 366. T.O. reported that he was the primary caregiver for his ten-year-old son, that he could perform basic activities of daily living, and that he typically spent his days at home resting or taking care of basic needs. *Id.* at 367. A mental status examination was largely normal, *id.*, but other tests showed more severe impairments. A WAIS-IV test and WMS-IV test revealed low average verbal intellect, non-verbal intellect, attention, and concentration; borderline general intellect, psychomotor and processing speed, visual memory, and immediate memory; and extremely low delayed memory and auditory memory. *Id.* at 368–69. T.O. exhibited no impairment on part A of the trail-making test, requiring him to connect only numbers, but showed impairment on part B, requiring connection of alternating letters and numbers, both by making two errors and by exceeding the time limit. *Id.* at 369.

Dr. Martin diagnosed T.O. with an unspecified neurocognitive disorder and unspecified depressive disorder, with a guarded prognosis and no significant changes expected in the next twelve months. *Id.* Dr. Martin assessed no significant limits on T.O.'s ability to complete simple and repetitive tasks; mild limits on maintaining regular attendance, performing work activities without special supervision, and accepting instruction; moderate limits on performing detailed and complex tasks, performing work activities on a consistent basis, interacting with coworkers and the public, and dealing with the usual stress of a competitive work environment; and marked limitation in completing a normal workday or workweek without interruptions resulting from T.O.'s psychiatric condition. *Id.* at 369–70. With respect to that marked limitation, Dr. Martin noted that T.O. "displayed significant deficits on various measures of cognitive functioning." *Id.* at 370. On a separate standardized form, Dr. Martin listed generally similar restrictions of up to moderate severity, but the form did not ask about T.O.'s ability to perform work without interruption, and Dr. Martin did not volunteer that restriction when asked if any of T.O.'s abilities were affected by his impairment. *See id.* at 371–72.

T.O. was evaluated by consulting neurologist Dr. Farah Rana on March 21, 2017. *Id.* 376.

T.O. reported that his seizures had decreased in frequency but not abated entirely, and that his most recent seizure was a month and a half before the evaluation. *Id.* His seizures were nocturnal but he could tell that he had one by soreness in his mouth, blood on his pillow, or incontinence in his bed, and his body would be sore for several days after a seizure. *Id.* Dr. Rana described T.O.'s depression and related symptoms as follows:

> The claimant reports that he was a heavy drinker from age 19. He quit drinking six or seven years ago. He has been having issues with severe depression. He states that he has bene under a lot of family stress going through a very difficult divorce. He has been having difficulty remembering things and he cannot focus. He forgets his appointments and on several occasions, he forgot very important things that he had to do. He was diagnosed with dementia by one of his doctors not too long ago, but he was not started on any memory medications.
>
> He has been taking medicine for depression for several months now, but he does not think it is making much difference. He continues to have depressed mood. He gets very anxious on little things.

*Id.* at 376–77 (paragraph numbers omitted).

In a written report, Dr. Rana concluded that T.O.'s seizure precautions could be relaxed because his seizures occurred at night, and assessed no physical limitations, but did not specifically address whether T.O. had any limitations as a result of his depression. *Id.* at 377. In a separate standardized form, Dr. Rana reported some relatively mild physical limitations and that T.O. would be limited to no more than occasional exposure to certain workplace hazards and moderate exposure to noise, and again did not address depression-related restrictions. *Id.* at 379–84.

### B. Administrative Hearing

ALJ Lisa Lunsford held a hearing on June 20, 2017. *Id.* at 34. T.O. appeared with his attorney. *Id.* at 36. The ALJ and T.O.'s attorney discussed outstanding records from a Dr. Kunin, and the ALJ agreed to hold the record open for T.O. to submit those, although it is not clear whether they were ever submitted. *See id.* at 39, 58.

In response to questions from the ALJ, T.O. clarified that he had not worked since his alleged onset date of October 1, 2014. *Id.* at 41–42. All of T.O.'s recent past work was installing drywall, which involved significant physical activity and carrying heavy loads. *Id.* at 42–43. He

8

had at one point been a supervisor, but not within the last fifteen years, because he reached a point where he "wasn't capable of being a leader." *Id.* at 43–44.

In response to his attorney's questions, T.O. said that his seizures were the main reason he stopped working. *Id.* at 45. He described himself as "literally bedridden" for up to two weeks after seizures from his "muscles and [his] joints being just stressed to their limits." *Id.* at 45–46. He testified that he experienced seizures approximately every two to three weeks before his surgery, and although the seizures themselves "would only last for a couple of minutes," the aftereffects would last for a period of a few days to up to two weeks, limiting his ability to get out of bed, his appetite, and his sleeping patterns. *Id.* at 46–47. According to T.O., the surgery did not entirely stop his seizures, but reduced them to the point that they are few and far between, and he has had only "approximately three since the surgery," including "maybe one" mild seizure in 2017. *Id.* at 47.

When asked why he could not return to drywalling now that his seizures occur less frequently, T.O. testified:

> I am just completely incapable physically. And to keep up with the time frame, the work hours, the ability, I just don't have the strength. I get, I just, I get lightheaded. I just don't have the physical force no more for one, much less the mental part because it's, I'm stressing all the time for no reason it seems like.

*Id.* at 48. He testified that he could not perform a desk job in the construction industry because he tried that in 2008 and "couldn't keep up with the mental load," and addressed his ability to do so in his current state as follows:

> I just don't have the focus, the ability to stay focused. I get headaches constantly, and just the ability to think like I used to think, it's just not there no more. I just don't have it.

*Id.* He identified his depression as beginning around the same time as his seizures began, when he was not able to attend work regularly and lost jobs as a result. *Id.* at 48–49.

T.O. identified Dr. Meador as treating him for depression by prescribing him medication, but stated that he thinks the medication increases his anxiety and reduces his ability to sleep. *Id.* at 49–51. He can go up to two or three days with only an hour or two of sleep. *Id.* at 50. As a result of his lack of sleep, he described his typical day as including "a lot of pacing and wandering," as

well as "headaches, . . . depression, crying, in a lost state." *Id.* at 51. At times, T.O. would cut grocery shopping trips short due to headaches. *Id.* at 52–53. He testified that he did not have the energy, ability, or motivation to get out of the house for anything other than grocery shopping or checking his mailbox. *Id.* at 53. He continues to think of suicide. *Id.* His wife filed for divorce and he moved in with his mother in Modesto. *Id.* at 50–51. T.O. shares custody of his son with his wife. *Id.* at 53–54.

The ALJ presented vocational expert Robin Scher (the "VE") with a hypothetical person of T.O.'s age, education, and work experience who is limited to medium work with moderate noise level, simple tasks, and only occasional exposure to changes in work routine, interaction with the public and coworkers, and certain workplace hazards. *Id.* at 55–56. The VE testified that such a person could not perform T.O.'s past work, which was classified as heavy, but could perform other jobs, including work as a motor vehicle assembler, a day worker ("essentially a house cleaner"), or an agricultural produce packer. *Id.* at 56. The VE testified that if such a person was unable to complete a forty-hour workweek, there would be no full-time work available, regardless of whether the person was also restricted to light or sedentary work. *Id.* at 56–57.

## C.    Regulatory Framework for Determining Disability

When a claimant alleges a disability and applies to receive Social Security benefits, the ALJ evaluates the claim using a sequential five step process. 20 C.F.R. § 404.1520(a)(4). First, if the claimant has engaged in "substantial gainful activity" during the alleged period of disability, the claimant is not disabled. *Id.* § 404.1520(a)(4)(i). Second, if the claimant has no "severe medically determinable impairment," the claimant is not disabled. *Id.* § 404.1520(a)(4)(ii). Third, if the claimant has an impairment that meets or equals the definition of an impairment specifically listed in the regulations, the claimant is disabled. *Id.* § 404.1520(a)(4)(iii). Fourth, if—based on the claimant's residual functional capacity—the claimant can still perform the claimant's past work, the claimant is not disabled. *Id.* § 404.1520(a)(4)(iv). At the fifth and final step, if the claimant cannot perform other work available in the national economy, the claimant is disabled, or if work is available that the claimant could perform, the claimant is not disabled. *See id.* § 404.1520(a)(4)(v). "The claimant bears the burden of proof at Steps One through Four, but the

burden shifts to the Commissioner at Step Five." *Barnes v. Berryhill*, 895 F.3d 702, 703 n.3 (9th Cir. 2018).

### D. The ALJ's Decision

The ALJ determined that T.O. had not engaged in substantial gainful activity since his alleged onset date and that he had three severe impairments: epilepsy, depression, and a neurocognitive disorder. *Id.* at 17. The ALJ concluded that T.O.'s epilepsy did not meet listing 11.02 because he did not have either: (1) seizures at least once a month for a period of three months;[5] or (2) seizures at least once every two months for a period of four months as well as a marked functional limitation. *Id.* With respect to T.O.'s mental impairments, the ALJ considered listings 12.02 and 12.04, but determined that T.O. did not satisfy either the "paragraph B" criteria of at least one "extreme" limitation or at least two "marked" limitations, or the "paragraph C" criteria of only marginal adjustment or a "serious and persistent" disorder persistent despite treatment. *Id.* at 18–19.

The ALJ determined that T.O. had the residual functional capacity ("RFC") "to perform medium work as defined in 20 CFR 404.1567(c) except occasional exposure to hazards (heights, moving machinery, operation of motor vehicle); moderate noise level environment; simple tasks with occasional changes in work routine; and occasional interaction with the public and coworkers." *Id.* at 19.

In reaching that conclusion, the ALJ acknowledged that T.O. testified to having frequent seizures with severe after-effects before his surgery, three seizures after his surgery, and depression. *Id.* at 19–20. The ALJ found that although T.O.'s "medically determinable impairments could reasonably be expected to cause the alleged symptoms," his "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." *Id.* at 20. The ALJ

---

[5] Neither the parties nor the ALJ address why T.O.'s seizures in December of 2014 and January and February of 2015 do not satisfy this listing, as well as the reported once-monthly frequency of seizures in 2014 before then and between April and August of 2015. *See* AR at 314, 352–53, 531, 459. The Court declines to resolve that issue sua sponte, but the Commissioner should consider it on remand, and if he stands by the conclusion that the listing is not met, should provide a more thorough explanation as to why.

summarized that conclusion as based on her view that "the objective medical findings in this case do not provide strong support for the claimant's allegations of disabling limitations." *Id.* at 21.

The ALJ largely rejected testimony and evidence concerning mental limitations, primarily because T.O. did not undergo regular mental health treatment, although the ALJ noted that T.O. received psychiatric medication for his depression from his neurologist Dr. Meador.[6] *See id.* The ALJ also identified the following purported inconsistencies in T.O.'s testimony: (1) T.O. testified to seizures occurring every two to three weeks, while the ALJ interpreted his pre-surgery treatment notes as indicating seizures only "once every few months"; (2) the ALJ characterized T.O. as having testified that his seizures lasted ten to fifteen minutes,[7] while he reported to Dr. Meador that they lasted less than five minutes; (3) "[t]he frequency of seizures since the surgery is not consistent with his allegations of total disability"; (4) "neurological and mental status examinations were generally normal," in contrast to T.O.'s testimony regarding severe symptoms; and (5) T.O. testified that Dr. Meador was treating him for depression when Dr. Meador was in fact primarily treating him for seizures, although the ALJ acknowledged that Dr. Meador prescribed T.O. medication for his depression. *Id.* at 21–22.

The ALJ credited most of examining psychologist Dr. Martin's opinions as to moderate limitations, but rejected "the moderate limitation in persisting and the marked limitation in completing a normal workday/work week because they are not supported by or consistent with the record as a whole," and because T.O. "is not in mental health treatment and there are no treatment records suggesting he could not complete a workday based on psychiatric reasons." *Id.* at 22. The ALJ also found T.O.'s involuntary psychiatric hospitalization and the GAF score of 25 assessed at that time to be of limited significance because it was "one instance," because T.O. was calm and no longer suicidal within days of his admission, and because he did not thereafter engage in mental health treatment despite repeated recommendations to do so. *See id.* at 21, 23.

---

[6] The ALJ's first reference to Dr. Kimford Meador uses the erroneous phonetic spelling "Dr. Kimball Metter" that appears in the hearing transcript rather the correct spelling that appears throughout T.O.'s medical records. *See* AR at 20.

[7] T.O.'s actual testimony was: "The seizures were only 10 to 15 minutes prior to waking always, and they would only last for a couple of minutes, the seizures themselves." AR at 46.

The ALJ gave partial weight to the non-examining state agency doctors, acknowledging that they lacked access to T.O.'s subsequent psychiatric hospitalization and Dr. Martin's examination, and therefore assessing somewhat greater limitations than those doctors identified. *Id.* The ALJ afforded little weight to T.O.'s wife's function report on the grounds that "it is a lay opinion based upon casual observation, rather than objective medical examination and testing," "it is potentially influenced by loyalties of family," and it "does not outweigh the accumulated medical evidence regarding the extent to which the claimant's impairments limit his functional abilities." *Id.* at 22–23.

Based on the residual functional capacity she assessed and the VE's testimony, the ALJ determined that although T.O. could not perform his past relevant work, he could perform other work available in the national economy, and therefore was not disabled. *Id.* at 23–24.

This Court's review of the ALJ's reasoning is complicated by her inclusion of only sporadic citations to evidence in the record, and particularly the absence of citations in the ALJ's discussion of purported contradictions undermining T.O.'s testimony and Dr. Martin's opinions. *See id.* at 21–23. Where the ALJ included citations at all, they are to exhibits as a whole—some of which extend upwards of seventy-five pages and cover treatment over many months—without page references, and thus are of minimal use in identifying the particular records on which the ALJ relies.

### E. The Parties' Arguments

T.O. argues that the Commissioner's decision should be reversed because the ALJ failed to provide sufficient reasons to discount Dr. Martin's opinions, in part based on the ALJ's failure to consider whether financial considerations or his impairment itself were responsible for T.O.'s lack of regular mental health treatment. Pl.'s Mot. (dkt. 28) at 8–10. T.O. also contends that the ALJ erred in failing to provide "specific, clear and, convincing findings" for rejecting his own testimony of subjective symptoms or "germane" reasons to discount his wife's report regarding his symptoms. *Id.* at 11–14. T.O. further argues that even under the ALJ's assessment of his residual functional capacity, he would not have been able to perform two of the jobs that the VE identified, because they require carrying out detailed instructions. *Id.* at 14–16. According to T.O., these

13

1  errors require remand for an award of benefits without further proceedings based on the Ninth

2  Circuit's "credit-as-true" doctrine. *Id.* at 16–17.

3      The Commissioner contends that the ALJ properly discounted Dr. Martin's opinions

4  because Dr. Martin did not have access to T.O.'s treatment records and because T.O. lacked

5  regular mental health treatment. Def.'s Mot. (dkt. 29) at 4–5. According to the Commissioner,

6  T.O. failed to present evidence that finances or his impairment prevented him from obtaining such

7  treatment, and assessments of T.O.'s generally intact insight and Dr. Meador's reference at one

8  point to a county mental health service suggest that neither of those reasons would apply. *Id.* at 5–

9  6. The Commissioner also argues that the ALJ did not err in rejecting T.O.'s symptom testimony

10 because doctors' evaluations—including after some of his seizures—showed generally normal

11 functioning, because T.O.'s seizures became far less frequent after surgery, and because T.O.

12 failed to pursue regular mental health treatment. *Id.* at 6–10. The Commissioner contends that the

13 ALJ's rejection of T.O.'s wife's report satisfies the lower standard of "germane reasons" on

14 generally the same grounds, that the third job identified by the VE would be sufficient to show

15 work available even if T.O. could not perform the other two, and that if the Court finds any error,

16 the appropriate remedy is remand for further administrative proceedings rather than for an award

17 of benefits. *Id.* at 10–16.

18      T.O. largely reiterates the arguments from his motion in his reply brief, and contends that

19 some of the Commissioner's arguments go beyond the reasoning presented by the ALJ or

20 evidence available in the record. *See generally* Reply (dkt. 30).

21      Both parties' briefs are strident. T.O. fails to address apparent conflicts between his

22 testimony and at least some of the medical evaluations after certain of his seizures, the substantial

23 decrease in frequency of seizures after surgery, or why Dr. Martin's assessment of "marked"

24 limitation in T.O.'s ability to work without interruption would require a finding of disability. The

25 Commissioner does not address the ALJ's apparent failure to acknowledge or follow controlling

26 legal standards and baselessly contends that T.O. "waived" arguments that he in fact presented

27 because he did not address all of the evidence that might weigh against those arguments. A more

28 level approach to the case by both sides would not only have provided a more useful presentation

14

of the issues to the Court, but might also have facilitated settlement at an early stage of the case.

## III.    ANALYSIS

### A.    Legal Standard

District courts have jurisdiction to review the final decisions of the Commissioner and have the power to affirm, modify, or reverse the Commissioner's decisions, with or without remanding for further administrative proceedings. 42 U.S.C. § 405(g); *see also* 42 U.S.C. § 1383(c)(3).

When asked to review the Commissioner's decision, the Court takes as conclusive any findings of the Commissioner which are free from legal error and supported by "substantial evidence." 42 U.S.C. § 405(g). Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion," and it must be based on the record as a whole. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "'Substantial evidence' means more than a mere scintilla," *id.*, but "less than a preponderance." *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988) (citation omitted). Even if the Commissioner's findings are supported by substantial evidence, the decision should be set aside if proper legal standards were not applied when weighing the evidence. *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978) (quoting *Flake v. Gardner*, 399 F.2d 532, 540 (9th Cir. 1978)). In reviewing the record, the Court must consider both the evidence that supports and detracts from the Commissioner's conclusion. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985)).

If the Court identifies defects in the administrative proceeding or the ALJ's conclusions, the Court may remand for further proceedings or for a calculation of benefits. *See Garrison v. Colvin*, 759 F.3d 995, 1019–21 (9th Cir. 2014).

### B.    The ALJ Erred in Rejecting Dr. Martin's Conclusions

Cases in this circuit distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (non-examining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). "[T]he opinion of a treating

15

physician is . . . entitled to greater weight than that of an examining physician, [and] the opinion of an examining physician is entitled to greater weight than that of a non-examining physician." *Garrison*, 759 F.3d at 1012.[8]

"To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (citations omitted). "[T]he opinion of a non-examining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician." *Id*. at 1202 (quoting *Lester*, 81 F.3d at 831). The Ninth Circuit has emphasized the high standard required for an ALJ to reject an opinion from a treating or examining doctor, even where the record includes a contradictory medical opinion:

> "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." [*Ryan*, 528 F.3d at 1198.] This is so because, even when contradicted, a treating or examining physician's opinion is still owed deference and will often be "entitled to the greatest weight . . . even if it does not meet the test for controlling weight." *Orn v. Astrue*, 495 F.3d 625, 633 (9th Cir. 2007). An ALJ can satisfy the "substantial evidence" requirement by "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Reddick* [*v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)]. "The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id*. (citation omitted).
>
> Where an ALJ does not explicitly reject a medical opinion or set forth specific, legitimate reasons for crediting one medical opinion over another, he errs. *See Nguyen v. Chater*, 100 F.3d 1462, 1464 (9th Cir.1996). In other words, an ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion. *See id*.

*Garrison*, 759 F.3d at 1012–13 (footnote omitted).

---

[8] The regulations governing treatment of medical evidence have been amended with respect to applications filed on or after March 27, 2017. *Compare* 20 C.F.R. § 404.1527 with 20 C.F.R. § 404.1520c. Because T.O. filed his application before that date, the older framework applies here, and this order need not consider what effect the regulatory change has on Ninth Circuit precedent regarding the weight afforded to different categories of medical opinions.

Here, Dr. Martin's opinion was not contradicted in any meaningful sense. With the possible exception of doctors who treated T.O. during his September 2016 hospitalization and considered him at serious risk of suicide, no other medical source performed a psychological evaluation of T.O. or had access to Dr. Martin's evaluation. The ALJ's full assessment of Dr. Martin's conclusions reads as follows:

> The undersigned gives partial weight to consultative examiner Dr. Martin. While his findings of moderate imitations are supported by the record and given great weight, the undersigned gives little weight to the moderate limitation in persisting and the marked limitation in completing a normal workday/work week because they are not supported by or consistent with the record as a whole. The claimant is not in mental health treatment and there are no treatment records suggesting he could not complete a workday based on psychiatric reasons.

AR at 22. This type of conclusory and boilerplate reasoning does not satisfy *Garrison*. The ALJ does not identify any evidence in the record that contradicts Dr. Martin's opinions. The ALJ also appears to have overlooked Dr. Martin's assessment of "extremely low" levels of functioning in certain respects, *id.* at 368–69, with the ALJ stating separately that T.O.'s "neurological and mental status examinations were generally normal," *id.* at 22.

While lack of treatment may in some cases provide a basis to discount opinions regarding severe symptoms, the Ninth Circuit disapproves of "'chastis[ing] one with a mental impairment for the exercise of poor judgment in seeking rehabilitation.'" *Nguyen*, 100 F.3d at 1465 (quoting *Blankenship v. Bowen*, 974 F.2d 1116, 1124 (6th Cir. 1989)). The effect of depression in particular on an individual's ability to seek and follow through on mental health treatment has long been recognized. *See id.* T.O.'s severe depression is noted in virtually every medical document in the record.

The Ninth Circuit has also recognized inability to afford treatment as a valid reason for not pursuing it. *See Smolen*, 80 F.3d at 1284. The record indicates that T.O. lost his insurance with Kaiser near the time of his alleged onset of disability, and that he was not able to obtain mental health treatment from the Stanford Hospital because his insurance would not cover it. *See* AR at 318, 535. Although Dr. Meador noted that T.O. planned to "seek psychiatric therapy from his county mental health department or via referral by his [primary care provider]," *id.* at 329, there is

no evidence that such services were in fact available and affordable to him. The Commissioner

cites out-of-circuit authority for the proposition that a plaintiff must present affirmative evidence

to support an inability to pay for treatment. Def.'s Mot. at 5 (citing *Goff v. Barnhard*, 421 F.3d

785, 793 (8th Cir. 2005)). This Court respectfully disagrees with that conclusion—at least where,

as here, there is evidence of at least one instance where a claimant was unable to obtain treatment

for financial reasons, *see* AR at 535—as inconsistent with an ALJ's duty to develop the record. In

this case, the ALJ based her conclusion that T.O. was not disabled in large part on T.O.'s failure to

obtain mental health treatment (other than his consistent prescriptions for psychiatric medication

from Dr. Meador and his involuntary psychiatric hospitalization), but did not ask T.O. about such

failure or otherwise raise the issue at the hearing.

The administrative record indicates that T.O.'s treating neurologist Dr. Meador believed

T.O. needed mental health treatment, at least one doctor at the Fremont Hospital believed his risk

of suicide was sufficiently high to warrant involuntary admission, *id.* at 405, and the only

psychologist who examined him in the context of his application for disability benefits concluded

he would have a marked limitation in completing work without interruption, *id.* at 369–70. While

the Commissioner argues that, unlike Dr. Martin, the ALJ was in a unique position to review the

entirety of T.O.'s medical record, an ALJ may not "arbitrarily substitute [her] own judgment for

competent medical opinion." *See Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) (citations

omitted).[9] Moreover, the Court "may not affirm the ALJ on a ground upon which [the ALJ] did

not rely," *Garrison*, 759 F.3d at 1010, and the ALJ did not identify Dr. Martin's lack of access to

medical records as a reason to disregard his opinions. The Court further notes that Dr. Martin's

lack of access to records might well have reduced the severity of his assessment— T.O. told Dr.

Martin that he had never been hospitalized for psychiatric reasons, and Dr. Martin had no access to

the records from his involuntary hold at the Fremont Hospital. *See id.* at 365–66.

---

[9] To the extent the ALJ's decision might be construed as suggesting not that T.O. lacked a marked limitation from his depression, but instead that any such limitations would have abated if he had pursued treatment, such a conclusion would be inconsistent with Dr. Martin's "guarded" prognosis and opinion that T.O.'s symptoms would not change significantly in the next twelve months. *See* AR at 369. Regardless, the Court does not view the ALJ's decision as amenable to such an interpretation.

The ALJ's failure to provide either "clear and convincing" or "specific and legitimate" reasons to reject Dr. Martin's opinion warrants reversal.

## C. The ALJ Erred in Rejecting T.O.'s Symptom Testimony

"The ALJ is responsible for determining credibility and resolving conflicts in medical testimony." *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989) (citing *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984)). To make such a determination, the ALJ must first determine "whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Treichler*, 775 F.3d at 1102 (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007)). Then, when there is no evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of [his] symptoms only by offering specific, clear and convincing reasons for doing so." *Smolen*, 80 F.3d at 128.[10] These reasons must be "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002). "General findings are insufficient." *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998) (internal quotation marks omitted).

Here, the ALJ acknowledged that T.O.'s medically determinable impairments could reasonably be expected to produce his symptoms and did not identify evidence of malingering. The ALJ failed to acknowledge, however, the controlling legal standard addressed above, and appears to have declined to credit T.O. because "the objective medical findings in this case do not provide *strong support* for [his] allegations of disabling limitations," *id.* at 21 (emphasis added), which does not satisfy that standard.

To the extent the ALJ provided specific reasons to reject his testimony, they are not convincing. As discussed in the context of Dr. Martin's opinions, the ALJ did not sufficiently consider reasons why T.O. might not have obtained regular mental health treatment (other than medication from Dr. Meador and his hospitalization). As also noted above, the ALJ's assertion that "neurological and mental status examinations were generally normal" overlooks Dr. Martin's

---

[10] The Commissioner objects, for the record, to this standard but acknowledges that the Court is bound by Ninth Circuit precedent.

assessment of "extremely low" performance in a number of areas of mental functioning. *See id.* at 22, 368. Many of the purported inconsistencies identified by the ALJ also do not hold up to scrutiny. While the ALJ faulted T.O. for testifying to pre-surgery seizures every two or three weeks as compared to evidence of seizures only "once every few months," AR at 21–22, T.O.'s neurologists repeatedly reported that his seizures occurred approximately monthly (which is more in line with T.O.'s testimony), including as late as August of 2015, *see id.* at 531. The ALJ's assertion that T.O. testified to seizures lasting ten to fifteen minutes, *id.* at 22, misstates T.O.'s testimony— T.O. stated that his seizures occurred ten to fifteen minutes before he awoke, but "would only last for a couple of minutes," *id.* at 46, which is consistent with all of the medical reports of their duration. To the extent the ALJ considered T.O.'s "testi[mony] that Dr. Meador at Stanford was treating him for depression when, in fact, he was seeing [T.O.] once every 3-4 months for his seizures" to be a conflict undermining T.O.'s credibility, T.O.'s testimony was in fact accurate—as the ALJ acknowledged, Dr. Meador prescribed T.O. antidepressants throughout the period at issue. *See id.* at 22.

The ALJ's errors in evaluating T.O.'s testimony of subjective symptoms therefore warrant reversal.

### D. Further Proceedings Are Necessary

"When the ALJ denies benefits and the court finds error, the court ordinarily must remand to the agency for further proceedings before directing an award of benefits." *Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir. 2017) (citing *Treichler*, 775 F.3d at 1099). "[A]n ALJ's failure to provide sufficiently specific reasons for rejecting the testimony of a claimant or other witness does not, without more, require the reviewing court to credit the testimony as true." *Treichler*, 775 F.3d at 1106. In appropriate circumstances, however, the court may order an immediate award of benefits under the Ninth Circuit's "credit-as-true" rule. *Leon*, 880 F.3d at 1045 (citing *Garrison*, 759 F.3d at 1019).

The district court may remand to the ALJ to calculate and award benefits when: (1) "the ALJ failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion"; (2) "there are [no] outstanding issues that must be resolved before a disability

determination can be made" and "further administrative proceedings would [not] be useful"; and (3) "on the record taken as a whole, there is no doubt as to disability." *Leon*, 880 F.3d at 1045 (citations and internal quotation marks omitted); *see also Garrison*, 759 F.3d at 1021 (holding that a district court abused its discretion in declining to apply the "credit as true" rule to an appropriate case). The "credit-as-true" rule does not apply "when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act," *Garrison*, 759 F.3d at 1021, when "there is a need to resolve conflicts and ambiguities," *Treichler*, 775 F.3d at 1101, or when there is ambiguity about when the claimant's disability began that is not solved by the record credited as true. *See Dominguez v. Colvin*, 808 F.3d 403, 409 (9th Cir. 2015).

Neither Dr. Martin's opinion nor T.O.'s testimony warrants application of the credit-as-true rule in this case. T.O. suggests that Dr. Martin's assessment of a marked restriction in T.O.'s "ability to complete a normal workday or workweek without interruptions resulting from [his] psychiatric condition," AR at 370, establishes disability because the VE testified there would be no work for someone who was "unable to complete a 40-hour workweek," *see id.* at 57, Pl.'s Mot. at 14. Dr. Martin in fact opined that T.O. would have only mild limitations in regular attendance and moderate limitations in consistent work performance, AR at 369, and the VE did not address whether "interruptions" as described by Dr. Martin would preclude work.

As for T.O.'s testimony, there is ample evidence in the record—much of it not addressed by the ALJ or the parties—that T.O. is not a reliable historian. Notably, many such examples consist of T.O. understating rather than overstating his symptoms, such as his statement to Dr. Martin that he had not been hospitalized for psychiatric reasons, *id.* at 365–66, and his statement during his hospitalization that he had no seizures since his surgery, *id.* at 445, when his neurologists had documented multiple seizures after his surgery, *e.g.*, *id.* at 669. While it is not clear that the long-term memory issues potentially implicated by these inconsistencies would affect T.O.'s ability to describe his typical symptoms, that remains an "outstanding issue[] that must be resolved before a disability determination can be made," and should be addressed by an ALJ in the first instance. *See Leon*, 880 F.3d at 1045.

Moreover, while neither party wants to admit that the record is not complete—the

Commissioner because it would require reversal, and T.O. because it would require further proceedings—key information appears to be absent. As noted above, T.O. failed to address *why* he did not obtain the mental health treatment recommended by nearly all of his treatment providers, and the ALJ failed to ask about that at the hearing. T.O. told Dr. Rana that he was diagnosed with dementia, but there is no record or other evidence of that diagnosis. *Id.* at 377. There is also no statement from any doctor who treated T.O. addressing the effects of his impairments, the most conspicuous absence being Dr. Meador. Such a statement should be obtained on remand if possible. Finally, the state agency doctors responsible for applying their medical expertise to T.O.'s collected medical records did so in 2015, well before most of the relevant evidence regarding T.O.'s psychiatric impairment was produced. It also does not appear that any treating or examining doctor had access to all of T.O.'s records, resulting in significant omissions like Dr. Martin preparing a psychological evaluation without knowledge that T.O. had been subject to involuntary psychiatric hospitalization. As neither this Court nor the ALJ has the medical training to perform that role, some form of review of the full record by a medical doctor or psychologist should be conducted on remand.

### E. The Court Does Not Reach T.O.'s Other Arguments

Because the ALJ erred in rejecting medical evidence and T.O.'s testimony, the Court does not reach T.O.'s arguments regarding his wife's function report and his ability to perform the jobs identified by the VE. The ALJ's reasons for rejecting T.O.'s wife's report are intertwined with the reasons for rejecting T.O.'s own testimony that will require reconsideration on remand. Even if the ALJ erred in rejecting her report, any such error would not support awarding benefits without further administrative proceedings, both because the Court is not aware of Ninth Circuit authority applying the credit-as-true rule to testimony from someone who is neither the claimant nor a qualified medical source, *see Garrison*, 759 F.3d at 1020 (stating that the rule applies to "claimant testimony or medical opinion"), and because T.O.'s wife's January 2015 report does not speak to his limitations after his largely successful surgery later that year.

Assuming for the sake of argument that T.O. is correct that two jobs identified by the VE were incompatible with the residual functional capacity assessed by the ALJ, the error would not

22

require a remand for an award of benefits because the third job alone likely satisfies the requirement of sufficient work available in the national economy, and even if it did not, remand would be necessary to determine whether other such jobs were available.

Although the Court does not reach a conclusion as to whether the ALJ erred in addressing these issues, the Commissioner is encouraged to consider them on remand.

## IV.    CONCLUSION

For the reasons discussed above, T.O.'s motion is GRANTED, the Commissioner's motion is DENIED, and the case is REMANDED for further administrative proceedings consistent with this order.

**IT IS SO ORDERED.**

Dated: March 27, 2020

JOSEPH C. SPERO
Chief Magistrate Judge